# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

NATHANIEL A. MCCRANIE,

      **Plaintiff,**

v.                              **Case No. 18-CV-722**

SHELLY NOEL, *et al.*,

      **Defendants.**

## DECISION AND ORDER

Plaintiff Nathaniel A. McCranie, a Wisconsin state prisoner, filed this *pro se* lawsuit under 42 U.S.C. § 1983. The court screened the complaint and ordered McCranie to file an amended complaint. (ECF No. 11.) McCranie filed an amended complaint, which the court screened and allowed him to proceed on Eighth Amendment claims against Advanced Correctional Healthcare, Inc. ("ACH"), John and Jane Doe ACH employees, and John and Jane Doe correctional officers. (ECF No. 13.)

After McCranie identified the parties he wished to sue, the court granted his motion to recruit counsel. (ECF No. 60.) Recruited counsel submitted a second amended complaint. (ECF Nos. 65 & 76.) The parties later stipulated to the dismissal of ACH. (ECF No. 90.)

The correctional officers and ACH employees separately move for summary judgment. (ECF Nos. 97 & 108.) McCranie, through counsel, opposes both motions, which are now before this court for resolution.

## BACKGROUND

The facts in this section are taken from the defendants' proposed findings of fact and declarations in support (ECF Nos. 99–101, 109 & 111); McCranie's responses to the defendants' facts, proposed facts, and declaration in support (ECF Nos. 103 & 113); and the defendants' responses to McCranie's proposed facts (ECF Nos. 105 & 114). The court will consider each party's proposed facts only to the extent they are supported by evidence in the record and will deem admitted any facts not properly contested. *See* Fed. R. Civ. P. 56(c)(1); Civil L. R. 56(b)(1)(C)(i), (b)(2)(B)(i)–(ii), and (b)(4); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). The court will consider arguments in the supporting memoranda only to the extent they properly refer to each party's statement of facts. *See* Civil L. R. 56(b)(6).

### A. The Parties

McCranie was a convicted felon incarcerated at the Sheboygan County Detention Center ("SCDC") for just over two months, from September 12, 2017, to November 15, 2017. (ECF No. 99, ¶ 1; ECF No. 113-1, ¶ 1 (page 20).) SCDC Correctional Officers Cindy Detienne, Paula Johnson, Robert Shaw, Paul Schneider, Mark Richter, M.L. Newby, John Tellen, T. Pollock, J. Kegler, M. Russ, and K. Rieck

2

(collectively, the "Officer Defendants") worked at SCDC during the time McCranie was incarcerated there. (ECF No. 99, ¶ 8.)

SCDC consists of a detention center, jail, and juvenile facility. (ECF No. 99, ¶ 4.) McCranie was housed only in the detention center during his incarceration at SCDC, and the Officer Defendants interacted with him only when they were assigned to work in the detention center. (*Id.*, ¶¶ 6 & 9.) SCDC contracts with ACH to provide medical services to inmates. (*Id.*, ¶ 10.) Nurses Marcia Bauer, Shelly Noel, Deborah Theis, Ashley Pfeifer, and Dr. Daniel Hekman (collectively, the "ACH Defendants") worked for ACH at SCDC during the relevant period. (ECF No. 109.)

### B. McCranie's Second Amended Complaint

McCranie alleges that he suffered symptoms of kidney stones between November 6 and 16, 2017, while an inmate at SCDC. (ECF No. 76, ¶¶ 25–26.) He alleges he made "numerous oral requests" for treatment to the Officer Defendants and Nurse Theis from November 5 through 14, 2017, but those defendants failed to provide him medical attention. (*Id.*, ¶¶ 27–28.) He alleges these defendants merely told him to fill out a medical request form, which he did, but the forms were not always available or answered when submitted. (*Id.*, ¶¶ 29–30.)

McCranie further alleges that Nurses Bauer and Noel examined him between November 6 and 14, 2017, for his complaints of abdominal pain but failed to notify a physician of his condition and merely advised him to stay hydrated. (ECF No. 76, ¶¶ 31–33.) McCranie alleges that Dr. Hekman never examined, treated, or advised him about his medications or symptoms. (*Id.*, ¶ 37.) McCranie alleges that Bauer,

3

Noel, and Hekman were aware of his preexisting chronic kidney disease. (*Id.*, ¶ 36.) He alleges that those defendants failed to provide alternative medication when his prescribed medication caused him additional issues. (*Id.*, ¶ 34.) He alleges that, once released from SCDC, he had surgery to remove a kidney stone. (*Id.*, ¶ 35.)

McCranie asserts that all defendants failed to provide him adequate medical care and were deliberately indifferent to his medical needs. (ECF No. 76, ¶¶ 40–41.) He alleges that, as a result of their deliberate indifference, he suffered pain, psychological issues, and a future diagnosis of diverticulitis. (*Id.*, ¶ 42.)

### C. The Medical Slip Process at SCDC

To obtain medical care at SCDC inmates complete and submit a Medical and Mental Health Request for Care form, also referred to as a "medical slip." (ECF No. 99, ¶ 13.) The medical slips are kept in all housing units at SCDC, or an inmate may request one from a correctional officer. (*Id.*, ¶ 14.) Medical slips allow SCDC officers and ACH staff to document an inmate's request for medical services and the treatment provided. (*Id.*, ¶ 18.) Unless there is a medical emergency, ACH doctors and nurses handle inmate medical care. (*Id.*, ¶ 11.) Correctional officers have only basic first aid and CPR training. (*Id.*, ¶ 12.)

Typically, an inmate describes the medical services desired on a medical slip and either gives it to an officer or places it in a designated drop box. (ECF No. 99, ¶ 19a.) Officers read the slip to ensure the request is not an emergency and leave it for ACH staff. (*Id.*, ¶ 19b–c.) ACH staff evaluate the request and either see the inmate for treatment and explain the treatment provided on the slip, with the date and a

4

signature, or respond only in writing if no examination is necessary. (*Id.*, ¶ 19d.) Officers return the medical slip to the inmate after ACH staff act on it. (*Id.*, ¶ 19e.) Officers do not write on the medical slips, respond on behalf of ACH employees, or determine an appropriate course of treatment on a medical slip. (*Id.*, ¶¶ 20–21.) Officers defer to ACH professionals' judgment and cooperate with their orders as needed, including providing inmates prescribed medications or taking basic vitals. (*Id.*, ¶ 21.)

The Officer Defendants state that an inmate's verbal request for medical care is not enough to receive care unless the officer believes the inmate is having a medical emergency. (ECF No. 99, ¶ 15.) For example, a correctional officer will immediately call medical staff and "take emergency action as necessary" for an inmate in visible distress or complaining of chest pain or difficulty breathing. (*Id.*, ¶ 16.) Otherwise, SCDC officers will direct inmates who verbally request care to fill out a medical slip. (*Id.*, ¶ 17.) McCranie "disputes that verbal requests for medical care are not sufficient for putting a prison official on notice of medical conditions and pain," but he does not cite any evidence in support of his dispute or dispute that officers will direct inmates who verbally request care to submit a medical slip. (ECF No. 103, ¶¶ 9–10.)

### D. McCranie's Medical Slips

On October 30, 2017, McCranie submitted a medical slip stating, "IM peeing blood my left side hurts like hell there is sum really wrong in lot of pain <u>EMERGENCY</u>." (ECF No. 99, ¶ 29; ECF No. 100-3 at 2.) The medical slip does not state the time McCranie submitted it. (ECF No. 100-3 at 2.) A correctional officer

provided the slip to ACH staff. (ECF No, 99, ¶ 29.) Nurse Bauer saw McCranie at around 9:45 a.m. that day. (*Id.*, ¶ 30.) She noted that McCranie had a history of kidney stones and had noticed blood in his urine the day before. (ECF No. 100-5.) She obtained a urinalysis, which confirmed the presence of blood, protein, and white blood cells in McCranie's urine. (*Id.*; ECF No. 109, ¶ 8.)

Nurse Bauer conferred with Dr. Hekman, who prescribed a one-week course of antibiotics for a possible urinary tract infection and Tylenol twice a day for pain. (ECF No. 99, ¶ 31; ECF No. 100-5.) Bauer also advised McCranie to "[d]rink lots of water." (ECF No. 99, ¶ 31; ECF No. 100-5.) ACH staff recorded on the October 30, 2017 medical slip having provided this course of treatment. (ECF No. 99, ¶ 32; ECF No. 100-3 at 2.)

That same day McCranie submitted a second medical slip requesting a new mattress, reiterating that he was "peeing blood (EMERGENCY)," and asking "what antibiotics are for and what's going on nobody talked to me." (ECF No. 99, ¶ 33; ECF No. 100-3 at 4.) The medical slip was provided to ACH medical staff, who responded the next day (November 1, 2017) that no extra mattresses were available and that the antibiotics were for treatment of a possible kidney stone and urinary tract infection. (ECF No. 99, ¶ 34; ECF No. 100-3 at 4.)

On November 2, 2017, McCranie submitted another medical slip, stating that his "pain has not even started to go away antibiotics really dont help [sic]," and the Tylenol was not enough for his pain. (ECF No. 99, ¶ 35; ECF No. 100-3 at 6.) He also stated that he was "going to talk to a lawyer making me suffer already." (ECF

6

No. 100-3 at 6.) ACH staff responded the next day (November 3, 2017) that the course of treatment was "what the jail MD ordered," that McCranie should complete the course of antibiotics as prescribed, that results may take time, and that staff could reevaluate once he had completed the course of antibiotics. (ECF No. 99, ¶ 37; ECF No. 100-3 at 6.)

On November 6, 2017, McCranie submitted another medical slip, stating that he had "taken the meds even though they made me crap and made my stomach hurt" and that both of his sides hurt. (ECF No. 99, ¶ 38; ECF No. 100-3 at 8.) McCranie did not specify which "meds" made his stomach hurt. (ECF No. 109, ¶ 55; ECF No. 100-3 at 8.) He stated that he had "been told sometimes if there to big kidney stones they would have to blast them." (ECF No. 100-3 at 8.)

Nurse Noel responded the same day that she had discussed McCranie's treatment with Dr. Hekman, who prescribed Flomax to help McCranie pass the probable kidney stone. (ECF No. 99, ¶ 39; ECF No. 100-3 at 8.) Noel noted that McCranie refused her request that he submit to a new urinalysis and told her "you people are playing games" after she explained that the second urinalysis could determine whether the previous treatment had improved his condition. (ECF No. 99, ¶¶ 39–40; ECF No. 100-3 at 8; ECF No. 100-6.)

From November 7 to 15, 2017, McCranie generally refused to take the prescribed Flomax, taking it only once. (ECF No. 109, ¶ 16; ECF No. 111-17.) On November 8, 2017, he submitted a medical request slip stating that he had a bad toothache, was vomiting and experiencing "hot & cold swe[a]ts," and still had kidney

7

pain but did not want to pass his kidney stone while he was experiencing those symptoms. (ECF No. 99, ¶ 42; ECF No. 100-3 at 9.)

The next day, November 9, 2017, Nurse Bauer saw McCranie for his complaints of a toothache and headache. (ECF No. 99, ¶ 43.) She consulted with Dr. Hekman, who prescribed a soft diet and ibuprofen. (*Id.*; ECF No. 100-7 at 1.) Nurse Bauer recorded that prescription on the November 8, 2017 medical slip. (ECF No. 99, ¶ 44; ECF No. 100-3 at 9.) The ACH Defendants state that McCranie did not complain of kidney issues during the November 9, 2017 appointment. (ECF No. 109, ¶ 20.) The medical records show a checked box next to "No other complaints by patient." (ECF No. 111-19 at 1.) McCranie states he was seen "for his principal complaint of a toothache and headache and Nurse Bauer did not examine or treat Plaintiff for kidney stone complaints on this date." (ECF No. 113-1, ¶¶ 20 & 7 (page 21).) But McCranie does not affirmatively state whether he complained to Nurse Bauer about kidney pain during the November 9, 2017 appointment.

Sometime between midnight and 4:15 a.m. on November 10, 2017, McCranie submitted another medical slip, stating that the nurses could not fix his issues and he "need to be taken to hospital no joke no more feeding me meds and to drink water antibiotics I was given made things worse." (ECF No. 99, ¶ 45; ECF No. 100-3 at 10.) In the section of the medical slip where the inmate is to designate the type of service requested, McCranie scribbled a dark "X" next to "Doctor" and wrote "Not" and drew an arrow pointing to "Nurse." (ECF No. 100-3 at 10.) Lieutenant Detienne reported to SCDC for duty at 2:45 a.m. (ECF No. 100-8 at 1.) During her shift change Sergeant

8

Schneider told Detienne that McCranie had verbally complained about kidney stones but refused to move to an observation cell. (ECF No. 99, ¶ 46; ECF No. 100-8 at 1.)

Detienne received a call at 4:15 a.m. from another correctional officer that McCranie had continued to complain of pain and believed he had kidney stones. (ECF No. 99, ¶ 47; ECF No. 100-8 at 1.) Detienne immediately went to McCranie's cell and asked him about his complaints and medical history, physically examined him, and had him provide a urine sample. (ECF No. 99, ¶ 48.) Detienne previously worked as an Emergency Medical Technician and believed she could conduct a basic physical examination of McCranie. (*Id.*, ¶ 49.) McCranie told Detienne he had burning pain in his lower abdomen and "has not voided his bladder" since the previous morning. (ECF No. 100-8 at 1.) She noted his urine was "tea colored w/fle[cks] of a bright red substance that looked like blood." (ECF No. 99, ¶ 48; ECF No. 100-8 at 1.)

At around 6:00 a.m. the same day Detienne consulted with Dr. Hekman and arranged for a Sheboygan County Sheriff's Department patrol car to transport McCranie to a local hospital's emergency department. (ECF No. 99, ¶ 50.) A doctor at the hospital (who is not a defendant) noted McCranie's complaints of sharp pain, inability to urinate, and hematuria (blood in his urine). (ECF No. 101-1 at 1.) McCranie reported no other complaints but told the doctor he had vomited the day before. (*Id.*) The doctor performed a CT scan on McCranie, which revealed a 9mm kidney stone on his left side. (ECF No. 111-33 at 8.) He provided McCranie fluids, prescribed Flomax to help him pass the stone and Toradol for pain, and concluded that McCranie would "likely need stone retrieval." (ECF No. 99, ¶ 51; ECF No. 101-1;

9

ECF No. 111-24; ECF No. 111-33 at 10.) The doctor scheduled McCranie for a November 13, 2017 follow-up with Dr. Jeffrey Welsch, a urologist (also not a defendant). (ECF No. 99, ¶ 51; ECF No. 101-1.) McCranie was not admitted to the hospital but was sent back to SCDC. (ECF No. 99, ¶ 51.)

McCranie returned to SCDC early that afternoon, and Nurse Noel recorded his diagnosis, examined him, and instructed him to hydrate and inform staff if his symptoms worsened. (ECF No. 99, ¶ 52; ECF No. 100-9.) At that time McCranie did not complain of kidney pain. (ECF No. 109, ¶ 29.) Noel contacted Dr. Hekman to inform him of the hospital's diagnosis. (*Id.*, ¶ 30.) Dr. Hekman ordered medical staff to continue the Flomax, discontinued ibuprofen, and prescribed Tylenol for pain. (*Id.*) Dr. Hekman states that ibuprofen can cause ulcers and kidney damage, and the prescribed Tylenol "was comparable in terms of pain control" to the Toradol the hospital prescribed. (*Id.*; ECF No. 111-20.) Because McCranie was seen at the hospital and by Nurse Noel the same day, ACH staff did not fill out a written response on McCranie's November 10, 2017 medical slip. (ECF No. 99, ¶ 53.)

McCranie continued to refuse to take the prescribed Flomax. (ECF No. 109, ¶ 32; ECF No. 111-17.) On November 13, 2017, he was taken to a clinic in Plymouth, Wisconsin, for his urology appointment with Dr. Welsch. (ECF No. 99, ¶ 54.) Dr. Welsch noted that McCranie previously was diagnosed with a kidney stone in June 2017, "but he walked out of the ER and was not seen by the doctor." (ECF No. 101-2 at 1.) Dr. Welsch recommended surgical removal of McCranie's kidney stone. (ECF No. 99, ¶ 54; ECF No. 101-2 at 1.) McCranie signed a written consent to

10

the surgery, which was scheduled for November 16, 2017. (ECF No. 99, ¶¶54–55; ECF No. 101-2 at 3.) McCranie continued to complain of pain, but Dr. Welsch did not order additional pain medication and told McCranie, "I don't have any control over that." (ECF No. 109, ¶ 33; ECF No. 101-2 at 1.)

Nurse Bauer informed McCranie of his scheduled appointment when he returned to SCDC from the clinic. (ECF No. 99, ¶ 55; ECF No. 100-10.) She also conferred with Dr. Hekman, who ordered that staff continue McCranie's Tylenol prescription until his scheduled surgery. (ECF No. 109, ¶ 35; ECF No. 111-29.) McCranie did not complain about pain at that time. (ECF No. 109, ¶ 34.)

The next day, November 14, 2017, Nurse Noel examined McCranie for his reports of increased pain when he yawned or breathed deeply. (ECF No. 99, ¶ 56; ECF No. 100-11.) She told him to continue hydrating and attempted to reach Dr. Welsch but was only able to leave a voicemail message for him. (ECF No. 99, ¶ 56; ECF No. 100-11.) McCranie did not receive further treatment at SCDC and was released from custody early the next morning, November 15, 2017. (ECF No. 99, ¶ 57; ECF No. 100-1.)

Dr. Hekman testified at a deposition that, as a correctional physician, he does not need to personally evaluate a patient in order to render appropriate care. (ECF No. 109, ¶ 52; ECF No. 111-9 at 32:2–11.) Dr. Hekman also testified that he had been informed that McCranie had a history of substance addiction, which he "may have considered" in treating McCranie's pain. (ECF No. 114, ¶ 6; ECF No. 111-9 at 41:4–11.)

11

**E. McCranie's Post-release Medical Treatment**

On November 15, 2017, after his release from SCDC, McCranie went to the emergency department at St. Nicholas Hospital in Sheboygan, where he was treated for complaints of abdominal pain. (ECF No. 99, ¶ 58; ECF No. 101-3.) The next day, November 16, 2017, McCranie had his scheduled surgery at Aurora Sheboygan Memorial Medical Center, where Dr. Welsch removed the kidney stone. (ECF No. 99, ¶ 59; ECF No. 101-4.)

**F. Expert Witnesses**

McCranie and the ACH Defendants each submitted reports from medical experts.

*1. McCranie's Expert*

McCranie retained Dr. Justin Ngene, a board-certified physician of internal medicine, who provided a case report reviewing McCranie's SCDC and medical records and summarizing his findings. (ECF No. 111-10 at 1–2.) Dr. Ngene concluded that, given McCranie's multiple complaints of pain, a physician should have evaluated him sooner after he had completed the first round of antibiotics. (*Id.* at 2.) He opined that McCranie should have undergone a CT scan on November 6, 2017, to address his complaints of continued pain. (*Id.* at 3.) Dr. Ngene further opined that McCranie's pain "was not adequately or timely addressed" and "[a]ttempts should have been made to get a surgical intervention sooner than planned" after he was diagnosed with the 9mm kidney stone. (*Id.* at 3–4.) He concluded that the delay in

12

treatment and surgery "likely subjected Mr. McCranie to unnecessary and prolonged serious pain despite the availability of obvious treatments." (*Id.* at 4.)

Dr. Ngene also testified about his report and findings. He stated that McCranie's history as "a poly-substance drug abuser" likely made him a "difficult patient." (ECF No. 111-11 at 54:18–55:1.) He stated it would be difficult to rely on McCranie's honesty or self-reports of pain and that it was important to avoid giving him narcotics. (*Id.* at 57:16–58:2.) Yet he also testified that McCranie's "drug-seeking behavior clouded a lot of opinions that were made during this whole process." (*Id.* at 99:23–25.) For example, he testified that, given McCranie's history, he should have received different pain medication from November 10 to 16, 2017, and an earlier surgical removal of the kidney stone "would have saved him a lot of pain." (*Id.* at 55:5–11.) Dr. Ngene testified that he "would have prescribed Oxycodone or something similar" for McCranie. (*Id.* at 97:7–9.)

Dr. Ngene testified that Dr. Hekman's prescription of Flomax was a reasonable treatment for kidney stones. (ECF No. 111-11 at 60:19–61:22.) He testified that McCranie should not have refused to take Flomax but left open the possibility that McCranie refused to take it because it had not helped in the past. (*Id.* at 62:4–25.) But he testified it was unreasonable for McCranie to refuse Flomax after doctors at both the jail and hospital prescribed it. (*Id.* at 84:1–5.) Dr. Ngene testified that it was reasonable to discharge McCranie from the hospital after he was taken there on November 10, 2017, if he were given adequate pain medication for his diagnosed

13

kidney stone. (*Id.* at 70:17–20.) He did not believe the surgery to remove his stone was emergent but testified that "the pain control is the issue." (*Id.* at 78:15–17.)

Dr. Ngene testified that he has no experience in correctional medicine. (ECF No. 111-11 at 53:9.) When asked if he felt qualified to testify about the standard of care for a physician practicing correctional medicine, he stated, "Maybe no." (*Id.* at 53:19-23.) He also testified that he did not feel qualified to testify about the standard of care for a reasonable nurse practicing in a correctional setting. (*Id.* at 54:7–10.) Dr. Ngene had no opinion of the treatment Nurses Noel, Bauer, Theis, or Pfeifer provided to McCranie between October 30 and November 15, 2017. (*Id.* at 52:15–53:1.) He offered no criticism of Dr. Hekman's initial treatment decisions of McCranie from October 30, 2017, or ACH staff decisions in response to McCranie's November 2, 2017 medical slip. (*Id.* at 58:8–59:15.) He testified that it was reasonable not to send McCranie for immediate surgery or hospitalization and reasonable to assume he did not need additional pain medication when he returned from the hospital on November 10, 2017. (*Id.* at 81:21–82:5.) Dr. Ngene testified that Nurse Noel acted reasonably when she called Dr. Welsch about McCranie's reports of pain on November 14, 2017, because he was scheduled for surgery with Dr. Welsch. (*Id.* at 85:5–19.) Dr. Ngene had no opinion about the actions of the Officer Defendants. (*Id.* at 98:4–10.)

## 2. The ACH Defendants' Expert

The ACH Defendants submitted a report from Dr. Nejd Alsikafi, a board-certified urologist. (ECF No. 111-15.) Dr. Alsikafi agreed with Dr. Ngene that

14

McCranie has "a complicated past medical history" that includes polysubstance abuse and narcotic-seeking behaviors. (*Id.* at 2.) Dr. Alsikafi summarized McCranie's medical slips and the treatment he received at SCDC. (*Id.* at 2–3.) He opined that medical staff at SCDC upheld the proper standard of care and timely and properly addressed McCranie's complaints. (*Id.* at 3–4.) He agreed with Dr. Hekman that a correctional physician would not need to be on site to evaluate patients "as long as a chain of command with the physician extender and the physician be in place." (*Id.* at 4.) He stated that chain of command was in place between Nurse Bauer and Dr. Hekman. (*Id.*) He noted that only when "conservative measures failed" did staff send McCranie to a hospital, where he was diagnosed with a kidney stone but not hospitalized and returned to the jail to continue the same course of treatment ACH staff had provided. (*Id.* at 3–4.) Dr. Alsikafi disagreed with Dr. Ngene's conclusion that there was a delay in McCranie's diagnosis and that he should have undergone a CT scan on November 6, 2017. (*Id.* at 4.) He also disagreed that ACH staff were deliberately indifferent to McCranie's medical issues and stated that any delay in his treatment "cannot be blamed on the medical providers of the jail." (*Id.*)

### G. Grievances

All new inmates are given an SCDC Inmate Handbook, which contains information about procedures at SCDC, including the inmate grievance process. (ECF No. 99, ¶ 3; ECF No. 109, ¶ 60.) The Inmate Handbook instructs inmates to attempt to informally resolve a problem with an officer before submitting a grievance. (ECF No. 100-12 at 5.) If that is unsuccessful an inmate may complete a grievance form,

15

which is submitted to SCDC supervisors for a formal response within ten working days. (ECF No. 109, ¶ 60; ECF No. 100-12 at 5.) SCDC policy 701.4 provides a process for inmates to grieve the healthcare they receive at SCDC. (ECF No. 113-5 at 9.) The policy refers inmates to the Inmate Handbook and provides that "Inmate grievances regarding health care issues will be investigated by the Site Manager or Corrections Adm[in]stration." (*Id.*)

During previous stays at SCDC before 2017 McCranie filed several inmate complaints and appeals, including complaints about healthcare received. (ECF No. 109, ¶¶ 61–62; ECF No. 113-4.) The ACH Defendants assert that McCranie's jail and medical files contain no grievances about the care he received between October 30 and November 15, 2017. (*Id.*, ¶ 63.) McCranie disputes this and states, without citation, that his "medical file does contain grievances regarding the care he was provided by the ACH Defendants from October 30, 2017 to November 15, 2017." (ECF No. 113-1, ¶ 63.)

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

16

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party, here the defendants, need not submit evidence negating the claims in the second amended complaint. *Id.* at 323. As the plaintiff in this matter, McCranie would bear the burden at trial of establishing that each defendant personally acted or failed to act in a way that violated his constitutional rights. To survive the defendants' motion for summary judgment, therefore, McCranie must show that sufficient evidence exists that would allow a jury to return a verdict in his favor, should the case proceed to trial. *See Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

## ANALYSIS

The court reviews McCranie's claims that he was provided improper medical care under the Eighth Amendment, which "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To state a valid Eighth Amendment claim the inmate must allege both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." *Petties v. Carter*, 836

17

F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see Estelle*, 429 U.S. at 103. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer*, 511 U.S. at 837).

"A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). "[E]ven brief, unexplained delays in treatment may constitute deliberate indifference." *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (quoting *Perez*, 792 F.3d at 777–78). How long of a delay is tolerable "depends on the seriousness of the condition and the ease of providing treatment." *Arnett*, 658 F.3d at 753 (quoting *McGowan*, 612 F.3d at 640).

The defendants do not dispute that McCranie's kidney stone and related symptoms were an objectively serious medical condition. The question is whether the defendants were aware of his issues and disregarded his need for medical treatment or otherwise took action "that [was] so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016).

### A. Officer Defendants

The only Officer Defendants who were involved in responding to any of McCranie's complaints or medical slips were Detienne and Schneider. McCranie

presents no evidence that officers Johnson, Richter, Russ, Shaw, Pollock, Rieck, Kegler, Newby, or Tellen knew about his kidney issues and disregarded his complaints. McCranie states, without citing any evidence, that these officers should have "undertaken" the same "investigations and actions" that Detienne took on November 10, 2017, as early as McCranie's October 30, 3017 complaint. (ECF No. 102 at 12.) But he does not identify any officers responsible for forwarding his medical request slips to ACH staff from October 30 through November 15.

The officers' schedules show that many did not even work in the detention center at SCDC during those days. (ECF No. 100-2 at 5–11.) Nor does McCranie cite evidence showing that the officers who interacted with him during that time were even aware of his condition. McCranie's insistence that these officers were aware of his condition and should have acted in a certain way, without evidence supporting that belief, cannot defeat summary judgment in their favor. *See Ammerman v. Singleton*, 817 F. App'x 265, 268 (7th Cir. 2020) (citing *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)); *see also Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (noting that, to establish liability under § 1983, "[t]he plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct"). Thus, officers Johnson, Richter, Russ, Shaw, Pollock, Rieck, Kegler, Newby, and Tellen are entitled to judgment as a matter of law.

As for Schneider and Detienne, the undisputed evidence shows that McCranie reported pain to Schneider sometime in the evening or early morning hours between November 9 and 10, 2017. McCranie does not present evidence establishing

specifically when he made those complaints. Schneider told Detienne about McCranie's complaints at 2:45 a.m. when they changed shifts. It is not clear how much time passed between McCranie's complaints to Schneider and Schneider reporting the complaints to Detienne.

Sometime during these early morning hours McCranie submitted a medical slip about his continued pain. It is not clear whether he submitted the medical slip before or after complaining to Schneider, and there is no evidence that either Schneider or Detienne saw the medical slip. Another correctional officer informed Detienne at 4:15 a.m. that McCranie continued to complain of pain. Detienne, who has experience as an EMT, immediately went to McCranie's cell to discuss his issues, examine him, and obtain a urine sample. She consulted with Dr. Hekman less than two hours later and arranged for McCranie's transport to a hospital for treatment.

McCranie asserts that Schneider delayed treatment for his pain, but he presents no evidence showing that Schneider caused a delay. He does not attest to a certain timeline. Specifically, McCranie presents no evidence establishing how much time passed between his complaints to Schneider and when Schneider reported the complaints to Detienne. Even if Schneider could have acted more quickly or differently, "his action must be reckless before § 1983 liability can be found." *Cavelieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003). He "was not required to take perfect action or even reasonable action." *Id.* The evidence does not show Schneider was reckless, disregarded McCranie's condition, or failed to act to address McCranie's complaints.

The evidence shows that Schneider informed Detienne of McCranie's complaints at 2:45 a.m., and another officer reiterated McCranie's complaints ninety minutes later, at 4:15 a.m. It was only after this second report that Detienne went to McCranie's cell, examined him, conducted a urinalysis, informed Dr. Hekman of McCranie's symptoms, and arranged for McCranie's transport to a local hospital. Although McCranie insists that it took "Detienne over four hours before investigating the Plaintiff's physical condition" (ECF No. 102 at 12), the evidence does not support such a finding. But the evidence does show she waited at least ninety minutes before addressing his complaints. The defendants do not explain why Detienne did not, or perhaps could not, attend to McCranie immediately upon being told by Schneider that he was in pain. But McCranie does not offer evidence suggesting that Detienne knew or should have known that he required *immediate* attention, and it is his burden to establish she acted recklessly to hold her liable under § 1983. *See Cavelieri*, 321 F.3d at 622.

The evidence does not suggest that Detienne was aware before meeting with McCranie that he had been receiving treatment for complaints of kidney pain. Detienne's actions, like Schneider's, may not have been perfect. But McCranie fails to provide evidence establishing that she acted recklessly by not evaluating him for ninety minutes after first learning of his complaints of pain. Because no reasonable jury could conclude that officers Schneider and Detienne deliberately disregarded McCranie's complaints, they are entitled to judgment as a matter of law.

21

## B. ACH Defendants

The ACH Defendants make several arguments why they should be dismissed. They assert that the nurses and Dr. Hekman provided adequate medical treatment, McCranie's complaints amount to only a disagreement of treatment, and McCranie failed to exhaust his administrative remedies.

### 1. Nurses Bauer and Noel

It is undisputed that Nurses Bauer and Noel were aware of McCranie's medical issues and responded to several of his medical slips. In response to his October 30, 2017 slip Nurse Bauer examined McCranie, consulted with Dr. Hekman, and provided McCranie the course of care Dr. Hekman prescribed. In response to his November 6, 2017 slip, Nurse Noel examined McCranie, consulted Dr. Hekman for a modified course of treatment, and attempted to conduct another urinalysis, which McCranie refused. Nurse Bauer responded to McCranie's November 9, 2017 slip, but there is a dispute about whether he complained of kidney issues during that examination.

When McCranie returned to SCDC after his hospital visit, Nurse Noel recorded his diagnosis, examined him, and instructed him to follow the doctors' prescriptions and directions. She also informed Dr. Hekman of the hospital's diagnosis and followed his additional directions. On November 13, 2017, Nurse Bauer reminded McCranie of his November 16, 2017 surgery appointment and conferred with Dr. Hekman. Nurse Noel examined McCranie on November 14, 2017, for his reports of increased pain and reached out to Dr. Welsch for his input. There is no evidence that Nurse

22

Bauer or Nurse Noel handled or were aware of McCranie's November 2, 2017 medical slip requesting stronger medication or his November 10, 2017 request for emergency treatment. McCranie's expert witness, Dr. Ngene, offered no criticism specific to any treatment either Nurse Bauer or Nurse Noel provided to McCranie.

McCranie takes issue with the delays before he saw a doctor or received emergency care and the adequacy of the prescribed pain medication. But it was not Nurse Bauer or Nurse Noel's decision when to send McCranie for emergency treatment or whether to prescribe him stronger pain medication. As nurses, Bauer and Noel were allowed to defer to Dr. Hekman's instructions so long as they did not "'ignore obvious risks to an inmate's health' in following a physician's orders." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012)). The nurses followed Dr. Hekman's orders to prescribe McCranie pain medication and antibiotics and his modification to include Flomax to address McCranie's continued complaints. When McCranie returned from the hospital, Nurse Bauer and Nurse Noel followed the orders given by the hospital's doctor and Dr. Hekman's modified treatment. Because the evidence does not show that either Nurse Bauer or Nurse Noel disregarded McCranie's complaints or ignored obvious risks to his health, no reasonable jury could conclude that either of them was deliberately indifferent to McCranie's medical issues.

### 2. *Dr. Hekman*

District courts do not interfere with a doctor's chosen course of treatment unless the chosen treatment represents a significant "departure from accepted professional standards or practices." *Pyles*, 771 F.3d at 409 (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). Dr. Ngene did not criticize Dr. Hekman's initial treatment for McCranie's pain and kidney stones. He opined that Dr. Hekman's prescribing Flomax to treat McCranie's pain and presumed kidney stone was a reasonable treatment. But Dr. Ngene also testified that McCranie's pain was not effectively managed. He testified that a physician should have evaluated McCranie sooner and that effort should have been made earlier to take McCranie for surgery. Dr. Ngene opined that delay likely caused McCranie "unnecessary and prolonged serious pain despite the availability of obvious treatments."

The ACH Defendants' expert, Dr. Alsikafi, disagreed with Dr. Ngene's conclusions. He opined that it was appropriate for Dr. Hekman to provide offsite treatment because the nurses were available to treat McCranie at SCDC. He further opined that it was reasonable to prescribe McCranie conservative treatment first before sending him to the hospital. Dr. Alsikafi concluded that the ACH Defendants were not responsible for any delay in McCranie's treatment.

It is disputed whether Dr. Hekman should have sooner examined McCranie, sooner sent him to a hospital for evaluation or surgery, or provided stronger pain medication. Given that dispute, a reasonable jury could conclude that Dr. Hekman

24

was deliberately indifferent to McCranie's medical issues. The court will deny summary judgment for Dr. Hekman.

### 3. Nurses Theis and Pfeifer

There is no evidence showing that Nurses Theis or Pfeifer reviewed McCranie's medical slips, were aware of his serious medical issues, or failed to provide him appropriate treatment. It is undisputed that Nurse Theis merely distributed pain medication to McCranie on November 9 and 13, 2017; and Nurse Pfeifer did the same on November 7 and 8, 2017. (ECF No. 113 at 9.) McCranie does not assert that either of these two nurses delayed or improperly distributed his medication. Dr. Ngene offered no criticism specific to Nurse Theis or Nurse Pfeifer. (*Id.*) Because no evidence shows that Nurses Theis or Pfeifer were aware of and deliberately indifferent to McCranie's kidney issues, no reasonable jury could find them liable under the Eighth Amendment. They are entitled to judgment as a matter of law.

### 4. Exhaustion of Administrative Remedies

The ACH Defendants assert that the claims against them should be dismissed because McCranie failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act, a prisoner in any jail or prison may not assert a cause of action under federal law about "prison conditions . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo*, 548 U.S. 81, 93 (2006). Exhaustion requires that an inmate comply with the rules applicable to the grievance process at the inmate's institution. *Pozo v. McCaughtry*, 286 F.3d 1022,

25

1025 (7th Cir. 2002). This requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

McCranie has presented no evidence that he submitted a grievance form about his kidney issues or treatment through the Jail's system before his release from SCDC on November 15, 2017. But McCranie was released before his kidney stone issues had resolved. He attempted to resolve his issues informally and by submitting several medical slips while at SCDC in which he complained that the treatment he was receiving was inadequate and that he continued to experience pain. The purpose of a grievance is "to give prison administrators an opportunity to address a shortcoming." *Glick v. Walker*, 385 F. App'x 579, 582 (7th Cir. 2010) (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)). SCDC officials had this opportunity before McCranie's release. Once released, McCranie could not have been expected to continue using SCDC's grievance system to address his medical issues or treatment.

It is not clear what more McCranie could have done within the SCDC's grievance system given the timeline of his medical issues and treatment. It would be inappropriate in these circumstances to conclude that he failed to exhaust his administrative remedies or to dismiss his claims on that basis.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the Officer Defendants' motion for summary judgment (ECF No. 97) is **GRANTED**. The Officer Defendants are **DISMISSED**.

**IT IS FURTHER ORDERED** that the ACH Defendants' motion for summary judgment (ECF No. 108) is **GRANTED in part and DENIED in part**. Summary judgment is **GRANTED** for ACH Defendants Bauer, Noel, Theis, and Pfeifer. These defendants are **DISMISSED**. Summary judgment is **DENIED** for ACH Defendant Dr. Hekman. McCranie's claims against Dr. Hekman shall proceed.

Dated at Milwaukee, Wisconsin this 21st day of October, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge